IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| DHW PURCHASING GROUP, LLC dba Carolina Pour House and DANIEL WELLS,<br><br>       Plaintiffs,<br><br>  v.<br><br>HUB INTERNATIONAL MIDWEST LIMITED, KEENANSUGGS INSURANCE, ALL RISKS, LTD., and THE BURLINGTON INSURANCE COMPANY,<br><br>       Defendants. | C/A No. 3:19-cv-1243-CMC<br><br><br><br>Opinion and Order<br>on Motions to Dismiss<br>ECF Nos. 28, 44, 47 |

Through this action, Plaintiffs Daniel Wells ("Wells") and DHW Purchasing Group, LLC ("DHW") (collectively "Plaintiffs") seek recovery for claims arising from the purchase of insurance and subsequent denial of coverage for two lawsuits. These lawsuits arose from incidents at The Carolina Pour House ("Pour House"), a business owned and operated by DHW. Plaintiffs seek recovery from the insurer, The Burlington Insurance Company ("TBIC"), as well as Hub International Midwest Limited ("HUB") and All Risks, LTD ("All Risks"), entities involved in the sale of the insurance policies.

The Second Amended Complaint also purports to name a fourth Defendant, KeenanSuggs Insurance, which is described as "an independent South Carolina entity . . . until August 1, 2016." ECF No. 22 ¶¶ 3, 4. Plaintiffs allege they purchased the policies at issue from an agency operating under this name, with the first policy taking effect in September 2014 followed by annual renewals

in September 2015 and October 2016.  ECF No. 22 ¶¶ 43, 49, 54, 55.  No such entity has been served.[1]  Thus, only TBIC, All Risks, and HUB are properly named or joined.[2]

The action is before the court on motions to dismiss filed by TBIC, HUB, and All Risks, all of which have been fully briefed.  *See* ECF Nos. 28, 43, 46 (HUB's motion, Plaintiffs' response, and HUB's reply); ECF Nos. 44, 51, 56 (TBIC's motion, Plaintiffs' response, and TBIC's reply); ECF Nos. 47, 54, 55 (All Risks' motion, Plaintiffs' response, and All Risks' reply).  For reasons set forth below, the motions are granted and the action is dismissed as to all causes of action.  Dismissal is with prejudice as to the first through fourth and sixth causes of action.  Dismissal is without prejudice as to the fifth (negligence) cause of action.

---

[1] By separate order, the court has determined there is no legal entity by this name.  *See* ECF No. 61 at 11 (finding "'KeenanSuggs Insurance' is not and was not a legal entity at the time the state court complaint was filed or at the time of removal" and "must either be treated as a fictitious or misnamed defendant").

[2] In its opening memorandum in support of dismissal, HUB argues it has not been properly served. ECF No. 28-1 at 6-8.  In response, Plaintiffs assert they properly served HUB on June 5, 2019 (shortly after HUB filed its most recent motion to dismiss).  ECF No. 43 at 6-7.  HUB does not challenge the adequacy of Plaintiffs' June 5, 2019 service on reply.  Thus, it appears HUB has now been properly served.

# BACKGROUND[3]

**Parties.** Wells is the sole member of DHW. ECF No. 22 ¶¶ 1, 2. In 2014, DHW "purchased the assets of [an] establishment known as the Pour House[,]" a business "licensed to serve alcoholic beverages." *Id.* ¶ 14. Acting on behalf of himself and DHW, Wells contacted an insurance agency doing business as KeenanSuggs Insurance to obtain insurance covering DHW"s operations including the Pour House. *Id.* ¶¶ 15-17. Working through All Risks, which Plaintiffs describe as a "licensed insurance [b]roker" and "specialty broker" (*id.* ¶¶ 6, 34), the insurance agency obtained a commercial general liability policy ("CGL Policy") with a Liquor License Endorsement ("Liquor Endorsement") from TBIC. *Id.* ¶¶ 15, 18, 43-45. HUB began operating under the trade name KeenanSuggs Insurance on or about August 1, 2016, after an asset acquisition. *See* ECF No. 22 ¶ 5 (characterizing transaction as "purchase" of KeenanSuggs Insurance).

**Policy Issuance and Renewals.** The first TBIC policy ("First Policy") took effect September 5, 2014, and covered a one-year period ("First Policy Period"). ECF No. 22 ¶¶ 43-45. Plaintiffs began the renewal application process in August 2015, and obtained a renewal policy covering the period September 5, 2015, through September 5, 2016, which was later extended into

---

[3] The background is drawn primarily from allegations in Plaintiffs' Second Amended Complaint, which are accepted as true for purposes of these motions. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Additional undisputed facts are drawn from documents referenced in the Second Amended Complaint and attached to TBIC's Answer to the Original Complaint. ECF No. 11-1 through 11-4 (TBIC Policies and Complaints for which Plaintiffs sought coverage). TBIC asserts and Plaintiffs do not dispute that the court may consider these materials in ruling on the motions to dismiss. *See* ECF No. 44-1 at nn. 2, 3, 4 (citing, *e.g.*, *Rockville Cars, LLC v. City of Rockville, Md.*, 891 F.3d 141, 145 (4th Cir. 2018)).

October 2016 ("Second Policy Period"). *Id.* ¶¶ 49-54; *see also* ECF No. 11-1 (copy of policy number HGL0042121 covering period September 5, 2015, to September 5, 2016 ("Second Policy")). The renewal process was initiated and portions of the application were completed by agents working for the entity or entities then doing business as KeenanSuggs Insurance.[4] ECF No. 22 ¶ 50. Plaintiffs' insurance policy was first extended into October 2016 and then renewed with the new policy covering from October 22, 2016, to October 22, 2017 ("Third Policy Period"). *Id.* ¶ 55. This policy is numbered 740BW37405 ("Third Policy"). ECF No. 11-2 at 1, 2.[5]

**Incidents and Lawsuits.** Two incidents occurred at the Pour House during the Second and Third Policy Periods that gave rise to lawsuits discussed below. ECF No. 22 ¶¶ 63-68, 76-79; *see also* ECF No. 11-3 (Complaint in "Chisolm Lawsuit"); ECF No. 11-4 (Complaint in "Yarborough Lawsuit") (collectively "Underlying Lawsuits").

**Chisolm Lawsuit.** In April 2017, Ryan Chisolm filed a lawsuit against Wells, DHW, and others alleging he was injured in an incident at the Pour House in March 2017. ECF No. 22 ¶ 63; ECF No. 11-3.[6] Plaintiffs characterize this lawsuit as alleging Chisolm suffered injuries "when Wells, acting as an agent and employee of DHW, negligently allowed [Chisolm] to fall to the sidewalk after removing him from the inside of the building during a disturbance." ECF No. 22 ¶

---

[4] This is the entity or entities Plaintiffs presumably intended to include by naming KeenanSuggs Insurance as a separate Defendant from HUB.

[5] The Third Policy is the only policy issued after HUB began operating under the trade name KeenanSuggs Insurance on or about August 1, 2016. The extension of the Second Policy from September 5, 2016, to October 22, 2016, also occurred after HUB began such operations. *See* ECF No. 22 ¶ 4; ECF No. 43 at 8 (asserting in argument that HUB arranged the extension).

[6] Thus, the Chisolm Lawsuit was filed and the alleged incident occurred during the Third Policy Period.

66; *see also id.* ¶ 64 (characterizing Chisolm Lawsuit as alleging "Wells was negligent in releasing [Chisolm] not realizing that he was unconscious").

The Complaint in the Chisolm Lawsuit characterizes the incident differently, alleging Chisolm witnessed an altercation in the Pour House and was the victim of a missed swing by an unknown male. ECF No. 11-3 ¶ 72. After these events, Wells and other agents of DHW began pushing everyone outside the establishment. *Id.* Chisolm alleges that, after he was outside, Wells approached him from behind and placed Chisolm in a chokehold that rendered Chisolm unconscious after which Wells "threw [Chisolm's] body down," causing him substantial injuries. *Id.* ¶¶ 74-76. Chisolm pursues a negligence claim "[a]gainst all Defendants" and multiple intentional tort claims against Wells. *Id.* ¶¶ 100-21.[7]

**Yarborough Lawsuit.** In June 2017, Matthew Yarbrough filed a lawsuit against Wells (individually and as owner of DHW) and Michael Lawrence seeking recovery for injuries sustained "when another patron struck [Yarborough] on the premises during an altercation" ("Yarborough Lawsuit"). ECF No. 22 ¶¶ 76, 77; *see also* ECF No. 11-4 (Complaint in Yarborough Lawsuit). The Complaint in the Yarborough Lawsuit alleges the incident occurred on or about

---

[7] Plaintiffs allege "the Chisolm claim was subsequently dismissed" and characterize "the actions of Defendants in response" to the Chisolm Lawsuit as "illustrative." ECF No. 22 ¶ 67. While this might suggest Chisolm's claims are addressed only for background, other allegations confirm Plaintiffs are seeking relief for denial of coverage of the Chisolm Lawsuit. *See, e.g., id.* ¶ 94 (seeking declaration "actions resulting in" both the Chisolm and Yarborough "lawsuits are covered" or, in the alternative, reformation of the policies); *id.* ¶¶ 102, 119, 146 (expressly referring to both Chisolm and Yarborough Lawsuits in support of second, fifth, and sixth causes of action); *but see* ECF No. 51 at 5 n.2 (arguing TBIC's motion to dismiss is premature because there is no current "set of allegations" defining the scope of Chisolm's claims).

August 20, 2016, when Lawrence "physically assaulted [Yarborough] by striking him in the face several times." ECF No. 11-4 ¶¶ 8, 12.[8] It alleges employees and agents of Pour House failed or refused to intervene and that Lawrence was acting as an agent and servant of Pour House. *Id.* ¶¶ 13, 16; *see also id.* ¶ 9 (alleging Lawrence was behind the bar serving drinks prior to the incident). Yarborough seeks recovery under negligence and intentional tort theories, as well as a statutory claim for "dram shop liability" under S.C. Code § 61-4-580.

**Tender of Defense.** Plaintiffs tendered the defense of the Chisolm and Yarborough Lawsuits to TBIC. ECF No. 22 ¶¶ 68, 79. TBIC denied coverage of both by letters dated May 11, 2017, and August 14, 2017, relying on similarly-worded Assault, Battery or Other Physical Altercation Exclusions (collectively "A&B Exclusion") applicable to both the CGL Policies and Liquor Endorsements. *Id.* ¶¶ 70, 73, 80, 83; *see also* ECF No. 11-1 at 41, 67 (Second Policy exclusions); ECF No. 11-2 at 41, 67 (Third Policy exclusions). Plaintiffs allege TBIC did not contact Plaintiffs and either did not investigate or conducted only a "sham investigation" before denying coverage. ECF No. 22 at ¶¶ 71, 72, 81, 82; *see also id.* ¶ 75 (characterizing denial of coverage of Chisolm Lawsuit as arbitrary, capricious, a violation of the insurance policy and public policy).

**Reliance on Agency Expertise.**[9] Plaintiffs allege Wells "sought to purchase certain policies of insurance, including General Liability and Liquor Liability insurance policies." ECF

---

[8] Thus, the Yarborough Lawsuit was filed during the Third Policy Period, but related to an incident that allegedly occurred late in the Second Policy Period.

[9] In broad terms, Plaintiffs' claims fall into two categories: (1) claims seeking construction of the policies to cover the Underlying Lawsuits; and (2) alternative claims seeking to hold Defendants

No. 22 ¶ 15.  He was referred by "[f]riends and acquaintances" to KeenanSuggs Insurance, whose agents "undertook to assist [Plaintiffs] in procuring policies of insurance to protect them from all of the many hazards involved in the business of selling alcoholic beverages." *Id.* ¶¶ 16, 17.  The agents of KeenanSuggs Insurance "held themselves out to be independent insurance agents representing Insurance Companies and brokers including defendants [All Risks] and TBIC." *Id.* ¶ 18.  They also "assured [Wells] that they . . . were capable and able to provide the coverage that he needed for his protection and the protection of his landlord[.]" *Id.* ¶ 19; *id.* ¶ 20 (both before and after KeenanSuggs Insurance was "acquired by" HUB, the insurance agency "held itself and its employees out as having the requisite expertise to assist Wells and DHW with their insurance needs"); *see also id.* ¶ 21 (alleging KeenanSuggs Insurance represented its agents "'listen to our clients to understand their business goals and risks to design insurance solutions for long-term success' and '[o]ur team understands the risks you face and the products you need to find the balance between price and protection of your family and assets'").

Both initially and "at each renewal" Wells "requested 'full coverage' which he understood to cover the complete spectrum of risks which DHW would be exposed to in operating its business" and he "understood and expected that he would be protected from simple negligence that occurred and from reasonably foreseeable risks including those that might customarily occur in his business including injuries caused to patrons as a result of negligence by the business or its employees." *Id.* ¶ 22 (also stating Wells' "purpose in acquiring the policies of insurance was to protect himself and the business from losses that might occur in the ordinary course of business.").

_____

liable for failing to either procure policies that would cover the Underlying Lawsuits or to alert Plaintiffs to the A&B Exclusion.  Allegations in this section go to the latter category of claim.

Plaintiffs allege Wells "explained DHW's needs and wishes fully to KeenanSuggs representatives each time he purchased or renewed coverage." *Id.* ¶ 24. "When Wells purchased coverage, he explained that he needed full coverage for both general and liquor liability which would include dram shop type claims as well as claims for physical injury on and about the premises." *Id.* ¶ 28. Plaintiffs allege on information and belief that "KeenanSuggs representatives were aware of this information and communicated the same to their principals and agents[] defendants [All Risks] and TBIC." *Id.* ¶ 29. They also allege "Wells knew that sometimes altercations could occur in establishments where alcohol is sold and understood and expected with the issuance of each policy that the policy issued covered DHW and Pour House for that type of occurrence." *Id.* ¶ 30. Plaintiffs allege Wells was "neither an experienced businessman or purchaser of insurance" and all Defendants "were aware of Wells['] status as a first-time business owner as well as his youth and inexperience." *Id.* ¶¶ 31, 32.

Plaintiffs allege All Risks' website advertised the following statement "[a]s agent of KeenanSuggs and [TBIC]" :

> Restaurants, bars, taverns, and nightclubs have more to worry about than daily specials and what's on tap, such as accidents in the kitchen and slips and falls from customers. Over-served patrons who get behind the wheel present a liquor liability. *Fights among patrons or those with security personnel account for numerous assault and battery claims.* Throw in a misguided dart, an unsuccessful mechanical bull ride or a fall on the dance floor and the recipe for risk increases. *All Risks is a leading restaurant insurance wholesale broker with specialists who can help you craft the best coverage for your clients.*

*Id.* ¶ 36 (emphasis added); *id.* ¶ 37 (alleging All Risks "advertised these precise dangers on [its] website until 2018").

Plaintiffs assert the above-quoted statement on All Risks' website demonstrates All Risks "recognized the risks" articulated. *Id.* ¶ 37.[10] While Plaintiffs suggest they *could have* relied on the statement, they do not expressly allege they did so or were even aware of it when insurance was procured. *See, e.g., id.* ¶ 51 ("Wells had information *available to him*, including [All Risks'] website and assurance of the agents of all of the defendants that the policy covered . . . against all risks including personal injury to a party on the premises because of contact with another individual." (emphasis added)); *id.* ¶ 58 (asserting information on All Risks' website "*would lead any reasonable person to believe* that when the insurance agent procured restaurant bar and nightclub coverage through [All Risks,] . . . their business was covered for risks including a situation where there was a 'fight among patrons or those with security personnel.'" (emphasis added)). Plaintiffs also allege Wells "asked and received assurances that he was covered for all potential losses that [Plaintiffs] might incur in their normal and reasonable operations." *Id.* ¶ 40.

**Agency Allegations.** Plaintiffs allege all Defendants are both agents and principals of each other, thus supporting imputation of knowledge, actions, or inactions by each of them to all of them. *E.g.*, ECF No. 22 ¶ 33 ("As agents and principals of each other, Defendants all had actual or imputed knowledge of Wells' status and naivete in matters concerning insurance."). Beyond basic allegations KeenanSuggs Insurance and HUB acted as independent insurance agents (albeit in different time frames), All Risks' acted as broker, and TBIC acted as insurer, Plaintiffs offer only conclusory allegations of agency relationships. *E.g., id.* ¶ 6 (describing All Risks

_____

[10] For purposes of this order, the court gives Plaintiffs the benefit of the doubt that paragraph 37 is intended to refer to All Risks' website as quoted in paragraph 36, rather than to paragraph 22 as actually stated. *see id.* ¶ 37. The reference to paragraph 22 appears to be a scrivener's error based on the location of the quotation in the Original Complaint.

"*principal* of KeenanSuggs and [HUB] and agent of TBIC" (emphasis added)); *id.* ¶ 34 (alleging All Risks "as an *agent* of KeenanSuggs, [HUB] and TBIC . . . represented itself as being a specialist in 'Restaurant Insurance including Bar, Tavern & Nightclub" (emphasis added)); *id.* ¶ 84 (alleging "KeenanSuggs dba HUB" acted "as agent of KeenanSuggs and TBIC"); *id.* ¶ 94 (seeking alternative ruling "TBIC's agents KeenanSuggs, HUB and [All Risks] made representations that bound TBIC"); *id.* ¶ 96 (alleging All Risks acted as "Principal and Agent of the other defendants" in publishing its marketing materials).

## STANDARD

A motion under Federal Rule of Civil Procedure 12(b)(6) should be granted only if, after accepting all well-pleaded allegations in the complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of its claims that entitles it to relief.  *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).   Although the court must take the facts in the light most favorable to the plaintiff, it "need not accept the legal conclusions [the plaintiff would draw] from the facts."  *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)).   The court may also disregard any "unwarranted inferences, unreasonable conclusions, or arguments."  *Id.*

The Rule 12(b)(6) standard has often been expressed as precluding dismissal unless it is certain that the plaintiff is not entitled to relief under any legal theory that plausibly could be suggested by the facts alleged.  *See Mylan Labs., Inc. v. Markari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  Nonetheless, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (quoted in *Giarratano*, 521 F.3d at 302).

In applying Rule 12(b)(6), the court also applies the relevant pleading standard. Despite the liberal pleading standard of Rule 8, a plaintiff in any civil action must include more than mere conclusory statements in support of a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (court need only accept as true the complaint's factual allegations, not its legal conclusions); *see also McCleary-Evans v. Maryland Dept. of Trans.*, 780 F.3d 582, 587 (4th Cir. 2015) (noting "*Iqbal* and *Twombly* articulated a new requirement that a complaint must allege a plausible claim for relief, thus rejecting a standard that would allow a complaint to survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some set of [undisclosed] facts to support recovery." (emphasis and alteration in original, internal quotation marks omitted)); *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278 (4th Cir. 2012) for proposition plaintiff need not forecast evidence sufficient to prove the elements of a claim, but must allege sufficient facts to establish those elements).

## DISCUSSION

## I.    Contract-Based Claims

### A.    Breach of Contract

**Allegations.**    In their first cause of action, Plaintiffs allege Defendant(s) breached contractual duties owed under a policy of insurance by denying coverage of the Underlying Lawsuits. *See* ECF No. 22 ¶ 98 (alleging "Defendants . . . fail[ed] to perform a contractual promise *to honor the parties' insurance policy*" (emphasis added)). Defendants argue this claim fails as a matter of law because the A&B Exclusion clearly precludes coverage of claims asserted in the Underlying Lawsuits. For reasons explained below, the court agrees.

**Standards.** "Insurance policies are subject to general rules of contract construction" and policy language must be given "its plain, ordinary and popular meaning." *Diamond State Ins. Co. v. Homestead Indus., Inc.*, 456 S.E.2d 912 (S.C. 1995). While "ambiguous or conflicting terms . . . must be construed liberally in favor of the insured," courts may not "torture the meaning of policy language to extend or defeat coverage that was never intended by the parties." *Id.* (holding trial court erred in construing policy to provide coverage beyond the policy limits).

Under South Carolina law, "[i]nsurers have the right to limit their liability and to impose conditions on their obligations provided they are not in contravention of public policy or a statutory prohibition." *B.L.G. Enter. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999). Applying this principle, South Carolina courts have given effect to dram shop liability and assault and battery exclusions. *Id.* (rejecting argument dram shop exclusion made coverage illusory and holding insurer had no duty to defend claim that fell within that exclusion); *Sphere Drake Ins. Co. v. Litchfield*, 438 S.E.2d 275, 276 (S.C. Ct. App. 1993) (holding insurer had no duty to defend insured for actions of its bouncers in removing patron following a disturbance because policy excluded "claims arising out of assault and battery, no matter the cause" and the alleged negligent acts "are not actionable without the assault and battery" that led to patron's removal).

**Policy Language.** The A&B Exclusion on which TBIC relied to deny coverage excludes coverage of "[i]njuries that fall within *any* of the following categories:

(1) Expected or intended from the standpoint of any insured.

(2) *Arising in whole or in part out of any "assault" or "battery" committed or attempted by any person*.

(3) Arising in whole or in part out of any *act or omission* in connection with *avoiding, preventing, suppressing or halting* any actual or threatened "assault" or "battery."

(4) Arising in whole or in part out of any actual or threatened verbal or physical confrontation or altercation committed or act or omission in connection with *avoiding, preventing, suppressing or halting any actual or threatened verbal or physical confrontation or altercation*.

*E.g.*, ECF No. 11-1 at 41, 67 (emphasis added).[11]

**Exclusion applied to Chisolm Lawsuit.** The A&B Exclusion clearly excludes coverage of all aspects of the Chisolm Lawsuit. Some of Chisolm's allegations fall under the first subpart of the exclusion for injuries "[e]xpected or intended from the standpoint of any insured." For example, the allegations Wells placed Chisolm in a chokehold until Chisolm was unconscious and then threw him to the ground without regard to the likelihood of harm fall under this subpart. ECF No. 11-3 ¶ 74-75 (alleging Wells "willfully, wantonly, carelessly and with reckless disregard threw [Chisolm's] lifeless body down"). Even if these allegations are not construed to allege Wells expected or intended *injury*, they would fall under the second subpart, which excludes injuries "[a]rising in whole or in part out of any 'assault' or 'battery' committed or attempted by any person." This is because, regardless of intent to cause "injury," the allegations clearly allege an intent to make contact in a manner that falls within even a narrow construction of the term "battery." The second subpart of the exclusion applies with or without Wells' personal involvement, because Chisolm's alleged injuries clearly arise *in whole or in part* out of an assault by *any person*. *See* ECF No. 11-3 ¶¶ 71-73 (alleging Chisolm witnessed an incident in the bar, during or after which an unidentified male swung at him, after which "everyone began being

---

[11] Additional language confirms the exclusion applies whether the injury results from an act or omission and regardless of the theory of relief (*e.g.*, negligence-based vs. intentional tort claims, direct vs. vicarious liability). The language is the same in exclusions applicable to both the Second and Third Policies' Liquor Endorsements, and the same except for minor nonsubstantive variations in both policies' CGL provisions.

pushed out of the establishment by [Wells] and employees, agents, and representatives of [DHW]," and Chisolm was again grabbed by the unidentified male).

Plaintiffs characterize the incidents addressed in the Chisolm Lawsuit substantially more favorably to Wells than does Chisolm. Most critically, they allege and argue Wells was acting to avoid harm. Under this characterization, Chisolm's Lawsuit would be excluded under the third and fourth subparts of the exclusion, which address acts or omissions in connection with avoiding, preventing, suppressing or halting actual or threatened assault, battery or physical confrontation or altercation. The second subpart would also still apply because the trigger for the sequence of events is an assault or battery. Thus, under either Chisolm's characterization of the event (as expressed in his complaint) or Plaintiffs' characterization, the A&B Exclusion precludes coverage of Chisolm's Lawsuit.[12]

**Exclusion applied to Yarborough Lawsuit.** The Yarborough Lawsuit also falls clearly within the broad A&B Exclusion. Yarborough alleges he was injured by an individual named Lawrence who was "acting as agent and servant" of DHW. ECF No. 11-4 ¶¶ 8, 12, 13, 16. Yarborough alleges Lawrence "physically assaulted and struck [Yarborough] repeatedly, while intoxicated and without cause or justification[.]" *Id.* ¶ 12. Yarborough seeks to hold DHW responsible both under intentional tort and negligence theories for actions and omissions. Like the

---

[12] Plaintiffs suggest TBIC's motion is premature as it relates to coverage of potential claims by Chisolm because there is no currently-pending lawsuit by Chisolm. *See supra* n. 7. The first difficulty with this argument is that Plaintiffs, not TBIC, filed this action and did so based, in part, on Chisolm's previously-filed lawsuit. The second difficulty is that the result (exclusion of the claim) is the same even under Plaintiffs' characterization of the incident that led to the Chisolm lawsuit.

Chisolm Lawsuit, the triggering event is an assault.  Thus, the claims arise in whole or in part out of an assault or battery by any person and are excluded at least under the second subpart of the A&B Exclusion.

**Alleged Ambiguity.**  With one exception, Plaintiffs do not address their arguments to the policy language.[13]  The one exception is an argument the A&B Exclusion's definition of "battery" to include any "physical contact with a person without his or her consent that entails some injury or offensive touching" is overbroad.  ECF No. 51 at 5-8.  Plaintiffs argue the failure to include an intent requirement imposes "an absolute standard that any event where someone is touched suffers an injury as a result of touching . . . such injury is excluded under the Policy."  *Id.*  (arguing such an interpretation would preclude coverage of incidents such as one patron tripping over another or an employee acting to move a person away from a falling object or other hazard); *id.* at 6 (noting policy definition of assault as well as civil tort of battery require intent and arguing an interpretation of battery not to require intent "creates an ambiguity that must be construed in Plaintiff[s'] favor").  Applying their proposed definition of battery, Plaintiffs argue the exclusion should not apply to the Chisolm Lawsuit because Wells was "acting to assist, not to attack."  *Id.* at 6.

Even if "battery" is construed as Plaintiffs' propose and the Chisolm Lawsuit, when ultimately refiled, is modified to allege facts consistent with Plaintiffs' characterization of Wells' intent, the A&B Exclusion would still preclude coverage.  As explained above, Wells' intent (and Plaintiffs' proposed narrower definition of battery) matters only for the first subpart of the

---

[13]  As explained below, Plaintiffs, instead, focus on arguments the policy language should be disregarded for various reasons including based on their reasonable expectations or public policy.

exclusion. Other subparts still apply for reasons explained above: the second, because the claim arose "in part out of any 'assault' or 'battery' committed or attempted by any person" (the disturbance leading to removal of patrons from the Pour House); and the third and fourth because Wells' actions, as described by Plaintiffs, were "in connection with avoiding, preventing, suppressing or halting any actual or threatened 'assault' or 'battery'" or "actual or threatened verbal or physical confrontation or altercation." Thus, even if accepted, Plaintiffs' argument that the term "battery" is ambiguous would not preclude dismissal.

**Reasonable Expectation.** Plaintiffs also argue coverage should be afforded for the Underlying Lawsuits based on their reasonable belief or expectation such claims would be covered. ECF No. 51 at 10-11. In support of this argument, Plaintiffs rely on *Bell v. Progressive Direct Ins. Co.*, 757 S.E.2d 399 (S.C. 2014), which held the court may consider "'the reasonable expectations of the insured at the time when he entered the contract *if the terms thereof are ambiguous or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print.*'" *Bell*, 757 S.E.2d at 407 (quoting and adopting rule in *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 927 (Del. 1982) (emphasis added)). However, *Bell* also recognized the reasonable expectations doctrine "cannot be used to alter the plain terms of an insurance policy." *Id.* at 407 (affirming summary judgment for insurer). As explained in *Ex Parte United Services Auto. Ass'n*, 614 S.E.2d 652 (S.C. App. 2005), "[t]he doctrine of reasonable expectations, which is essentially that the objectively reasonable expectations of insureds as to coverage will be honored even though a careful review of the terms of the policy would have shown otherwise, *has been rejected in South Carolina.*" *Id.* at 654 (emphasis added).

South Carolina's limited application of the doctrine of reasonable expectations is consistent with South Carolina's broadly applied rule that "[o]ne entering into a contract should read it and avail himself of every reasonable opportunity to understand its contents and meaning." *Doub v. Weathersby-Breeland Ins. Agency*, 233 S.E.2d 111, 114 (S.C. 1977). As the South Carolina Supreme Court explained in *Doub*, this rule precludes an insured from recovering based on allegations his insurance agent misrepresented the terms of a policy where the insured "had eighteen months to inform himself as to the terms, conditions and exclusions in the written contract" but "made no effort to do so" including having "never read the contract." *Id.*

*Doub* distinguished *Riddle-Duckworth, Inc. v. Sullivan*, 253 S.C. 411, 171 S.E.2d 486 (1969), "where the insured had read the policy contract, had not understood the coverage on certain items, including the [particular operation excluded], and had specifically asked" whether the critical operation was covered and had been assured by the "experienced insurance agent . . . that it was." *Id.* at 114. In contrast, in *Doub*, the insured "made no inquiries as to any of [the policy's] specific terms and provisions" and, consequently, did not rely on an agent's explanation of an unclear term of the policy.

For reasons explained above, the plain language of the broad A&B Exclusion clearly precludes coverage for the Underlying Lawsuits, and there is no ambiguity that would have allowed for a reasonable expectation of coverage had Plaintiffs read the Policies. Neither are there any conflicting provisions or any allegations that support an inference the exclusion was presented in a manner that created a hidden trap or pitfall or took away in fine print what was given by large print.

To the contrary, had Plaintiffs reviewed even the list of endorsements, they would have been alerted to the A&B Exclusion.[14]  Had they read the listed endorsements, they should have understood the A&B Exclusion would preclude coverage for claims such as those asserted in the Underlying Lawsuits.  It follows that Plaintiffs cannot argue for modification of the A&B Exclusion based on the doctrine of reasonable expectations.

**Public Policy.**  Plaintiffs also argue the A&B Exclusion violates Section 61-2-145 of the South Carolina Code.  This section requires that, *after July 1, 2017*, "person[s] licensed or permitted to sell alcoholic beverages . . . [are] required to maintain a liquor liability insurance policy or a general liability insurance policy with a liquor endorsement[.]"  S.C. Code Ann. § 61-2-145.

This argument fails for multiple reasons.  First, the statute is directed to the coverage a *licensee* must obtain, not to terms an insurer must offer.[15]  Second, the incidents at issue in the

---

[14]  The A&B Exclusion and other endorsements were drawn to Plaintiffs' attention by the "Listing[s] of Forms and Endorsements" included with each policy ("Endorsement Lists").  ECF No. 11-1 at 3, 4; ECF No. 11-2 at 3, 4.  Both pages of each Endorsement List include the following statement at the top of the page:  "THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY."  *Id.*  The exclusions themselves also begin with a large-print bold heading that states:  "THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY."  *Id.*  This heading is then followed by an even larger print bold heading that reads "EXCLUSION – ASSAULT, BATTERY OR OTHER PHYSICAL ALTERCATION."  *Id.*

[15]  *See generally Northfield Ins. Co. v. Evian HPR,* No. 9:01-883-23, 2002 WL 32332186 (D.S.C. Aug. 28, 2002)*, aff'd sub nom. Northfield Ins. Co. v. Evian Horizontal Prop. Regime,* 68 F. App'x 487 (4th Cir. 2003) (holding statute that required "council of co-owners" to insure the regime against risks did not void exclusion in policy because, even if risk was required to be covered, the duty to procure coverage fell on the insured, not the insurer).

Underlying Lawsuits occurred and the policies were issued *before* July 1, 2017.[16] Third, Plaintiffs, in fact, had coverage with a Liquor Endorsement when the incidents occurred.[17]

**Reformation Unavailable.** Plaintiffs do not assert a claim for reformation or seek such relief under either of their contract-based claims. They, nonetheless, argue TBIC may be obligated to provide coverage beyond what the policy language affords based on other Defendants' representations. *See* ECF No. 51 at 12 (citing, *e.g.*, *Crosby v. Protective Life Ins. Co.*, 359 S.E.2d 298 (S.C. Ct. App. 1987)). Addressing a claim for reformation of an insurance policy, *Crosby* explained "[a] court of equity may reform a contract" for unilateral mistake where that mistake was either (1) "induced by the fraud, deceit, misrepresentation, concealment or imposition in any form of the party [that opposes] reformation without negligence on the part of the party [seeking reformation]"; or (2) "where the mistake is accompanied by very strong and extraordinary circumstances showing imbecility or something which would make it a great wrong to enforce the agreement." *Crosby*, 359 at 301. These circumstances are not present where the claimed "mistake" would have been easily resolved by reading the written instrument. *Id.* (finding no grounds for reformation in part because the insured had not read the policy when he received it

---

[16] The Third Policy took effect in October 2016. The Chisolm Lawsuit relates to an incident in March 2017 and was filed April 2017. The Yarborough Lawsuit relates to an incident that occurred in August 2016 and was filed in June 2017.

[17] The statute requires a Liquor Endorsement or policy but does not specify what that endorsement or policy must cover. Most critically, nothing in this statute or any other authority cited by Plaintiffs suggests an insurer may not exclude claims arising in whole or in part from an assault, battery, or other altercation. In contrast, multiple cases applying South Carolina law have upheld and applied such exclusions (albeit prior to enactment of Section 61-2-145). *See Sphere Drake Ins. Co. v. Litchfield*, 438 S.E.2d 275, 276 (S.C. Ct. App. 1993).

19

and "had no trouble ascertaining the meaning of the relevant term when he read it after the claim arose").  Here, as in *Crosby*, Plaintiffs do not and cannot argue reading the policy would not have alerted them to the exclusion.  It follows that they cannot seek reformation, whether under their contract or any other claim.[18]

**Recharacterization of Contract Claim.**  In opposing Defendants' motions to dismiss, Plaintiffs characterize their breach of contract claim as also seeking relief for Defendants' failure to procure and deliver a policy with proper or promised coverage.  This characterization of the contract claim is inconsistent with the allegations of the Second Amended Complaint which alleges Defendants breached "a contractual promise *to honor the parties' insurance policy.*"  ECF No. 22 ¶ 98.[19]

Even if the contract claim could be construed (or was amended) to allege breach of a duty to procure particular coverage, it would fail for essentially the same reasons addressed above. Plaintiffs had the policies for an extended period of time before the events at issue in the

---

[18]  The second ground for reformation is inapplicable because, despite relying on Wells' naivete in matters of insurance, Plaintiffs do not allege Wells lacked the mental capacity to read and understand the insurance policy or any other ground that would make it a "great wrong to enforce" the policies as written.

[19]  In contrast, the negligence and constructive fraud claims include allegations Defendants owed duties to provide information (or assistance) relating to the insurance policy. *Id.* ¶ 116 (alleging under negligence claim that "Defendant TBIC . . . entered into a contract . . . to provide insurance coverage" and "[e]ach of the Defendants owed Plaintiffs a duty to honestly and truthfully represent the extent of the coverage and to explain any limitations"); *id.* ¶ 120 (alleging under constructive fraud claim that Defendants owed Plaintiffs a duty to "exercise due care and to place coverage as represented"); *id.* ¶¶ 130, 132, 137 (alleging "KeenanSuggs and HUB[,]" as agents for all Defendants, had a special relationship with Plaintiffs, made representations Plaintiffs had "purchased coverage which would protect [them] to the fullest extent available[,]" but should have known the policy did not provide full coverage).

Underlying Lawsuits occurred and, during this extended time, could have discovered any failure to procure the coverage desired simply by reading the policy. Had they read the policy and discovered it was not as they intended, Plaintiffs could have sought different coverage. Instead of doing so, Plaintiffs repeatedly renewed coverage (including obtaining the Third Policy on which the contract claim expressly relies) without seeking modification. Under these circumstances, Plaintiffs' own duty to read the policies would preclude them from recovering under a contract theory for any Defendant's failure to procure and provide requested coverage.

**Failure of Contract Claim.** In sum, the plain language of the A&B Exclusion precludes coverage of injuries arising from the incidents alleged in the Underlying Lawsuits because those injuries fall within at least one of the subparts of that exclusion. Plaintiffs' arguments for avoiding the plain language of the policy fail as a matter of law for reasons addressed above. Plaintiffs fail to suggest any allegation that might cure the deficiencies in their contract claim. Accordingly, Plaintiffs' first cause of action is dismissed with prejudice.

### B.     Breach of Contract Accompanied by Fraudulent Acts

To plead a claim for breach of contract accompanied by a fraudulent act (or acts), Plaintiffs must plead three elements:  (1) breach of a contract; (2) fraudulent intent *relating to the breach*; and (3) a fraudulent act." ECF No. 51 at 16 (citing, *e.g.*, *Harper v. Ethridge*, 348 S.E.2d 374, 378 (S.C. 1986)). Plaintiffs' second cause of action rests on *alleged breach of the insurance policy* and the alleged fraudulent acts are representations made *prior to the purchase of the policy*. *See* ECF No. 22 ¶¶ 101, 102 (incorporating prior allegations and alleging "conduct as mentioned above, to wit, representing . . . incidents such as those which . . . caused injury to Chisolm and Yarborough would be covered by the policy, only to deny coverage later, was done with fraudulent intent and accompanied the breach").

21

For reasons explained above, Plaintiffs cannot establish the first element of the claim (breach of the insurance policy). They cannot establish the second and third elements because the alleged fraudulent actions (and any related intent) are representations made *prior to or at the time coverage was obtained*. ECF No. 22 ¶ 102. Thus, the alleged fraudulent intent and acts relate to and accompany contract *formation*, not breach.

Plaintiffs fail to suggest any allegations that might cure these deficiencies. Accordingly, the second cause of action for breach of contract accompanied by a fraudulent act is dismissed with prejudice.

## II.    Improper Claims Practices Claims

Plaintiffs assert two causes of action against TBIC based on allegedly improper claims practices. Plaintiffs concede one of these claims (fourth cause of action for violation of S.C. Code Ann. § 38-59-20) should be dismissed because the statute does not provide a private cause of action. The other (third cause of action for bad faith failure to pay insurance benefits) fails for reasons explained below.

An insurer is not liable for bad faith refusal to pay a claim if it had a reasonable basis for denying or contesting a claim. *Helene Chem. Co. v. Alliancz Underwriters Ins. Co.*, 594 S.E.2d 455, 462 (S.C. 2004) (holding there could be no bad faith refusal to pay where court found claim was not covered); *BMW of N. Am., LLC v. Complete Auto Recon Servs., Inc.*, 731 S.E.2d 902, 907 (S.C. Ct. App. 2012) (holding insurer could not have acted in bad faith in denying claim for coverage where no coverage existed under the policy). Given the conclusion above that the A&B Exclusion precludes coverage of the Underlying Lawsuits, TBIC necessarily had a good faith basis for denial of the claims.

Plaintiffs fail to suggest any allegations that might cure the deficiencies in the third cause of action and concede the fourth cause of action does not state a claim. Accordingly, these causes of action are dismissed with prejudice.

### III.  Negligence Claim

Plaintiffs' fifth cause of action seeks recovery under negligence theories (simple and gross negligence) from all Defendants based on allegations "[e]ach of the Defendants owed Plaintiffs a duty to honestly and truthfully represent the extent of coverage and to explain any limitations in coverage[.]"  ECF No. 22 ¶ 117.  Plaintiffs allege Defendants breached this duty by failing to "correct their misrepresentations as to coverage or to affirmatively explain the so-called 'Assault and Battery' exclusion and its profound impact on the coverage being purchased" despite Plaintiffs having "clearly articulated their requirements for coverage." *Id.* ¶ 118.  Plaintiffs also allege Defendants "owed a duty . . . to exercise due care and to place coverage as represented which . . . would include [coverage of] the risks described in marketing materials" (apparently referring to language on All Risks' website). *Id.* ¶ 120  They further allege Defendants owed Plaintiffs a duty to "honestly represent the coverage" and "notify [Plaintiffs] that the coverage being provided was not the same as the coverage represented." *Id.* ¶ 121; *see also id.* ¶ 124 (alleging Defendants "breached . . . duties owed to [Plaintiffs] to provide the coverage represented [and] to explain any gaps or problems with coverage").

**Duty to pay claims.**  To the extent the negligence claim alleges any Defendant owed a duty based on the insurance policy or policies, it fails because breach of such a duty may be pursued only through a claim for breach of contract. *See Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995) ("A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and

a tort action will not lie."). Allegations one or more Defendants breached a duty to undertake defense of the Underlying Lawsuits or pay related claims necessarily rely on duties arising from the insurance policy and, consequently, fail to support a negligence claim.

**Duty to "place coverage as represented."** The allegation Defendants had and breached a duty to "place coverage as represented" refers to marketing materials as a source of the representation. *Id.* ¶ 120 (cross referencing ¶ 22). Giving Plaintiffs the benefit of the doubt, this may be intended to refer to the statements on All Risks' website that (1) "[f]ights among patrons or those with security personnel account for numerous assault and battery claims" and (2) All Risks "is a leading restaurant insurance wholesale broker with specialists who can help you craft the best coverage for your client." *See* ECF No. 22 ¶ 36. The same excerpt refers to "accidents in the kitchen[,]" "slips and falls from customers[,]" "overserved patrons who get behind the wheel[,]" "misguided dart[s,]" "unsuccessful mechanical bull ride[s,]" and "fall[s] on the dance floor" as risks faced by "[r]estaurants, bars, taverns and nightclubs." ECF No. 22 ¶ 36.

As the last sentence of the quotation reveals, the alleged statement on All Risks' website is directed to *insurance agents*, not consumers. Further, rather than indicating the listed risks are necessarily covered by insurance, the quotation suggests they are risks that *need to be considered* in "craft[ing] . . . coverage for [their] clients." Thus, at most, the quoted language might have led an insurance consumer who read it to believe All Risks *could* procure insurance that would cover each of the listed risks including fights among patrons or with security personnel. It could not reasonably have been construed as a representation each of the risks listed would be included in policies obtained through All Risks. Neither does the quoted language raise an inference any

24

Defendant *was aware of Plaintiffs' subjective belief* as to the scope of coverage, much less that this awareness imposed a duty on any Defendant to obtain coverage for all of the listed risks.[20]

Likewise, Plaintiffs' preceding allegations regarding their requests for "full coverage," assurances they were "covered for all of the potential losses [they] might incur in their normal and reasonable operations," or were "covered . . . against all risks including personal injuries . . . because of contact with another party" are not sufficient to raise an inference any Defendant had a duty to procure coverage other than what was provided. *See* ECF No. 22 ¶¶ 22, 28, 39, 40, 51, 56.[21] This is because "[a] request for 'full coverage,' 'the best policy,' or similar expressions does not place an insurance agent under a duty to determine the insured's full insurance needs, to advise the insured about coverage, or to use his discretion and expertise to determine what coverage the insured should purchase." *Trotter v. State Farm Mut. Auto. Ins. Co.*, 377 S.E.2d 343, 347 (S.C. Ct. App. 1988).

As explained in *Trotter*:

Generally, an insurer and its agents owe no duty to advise an insured. . . . If the agent, nevertheless, undertakes to advise the insured, he must exercise due care in giving advice. . . . An insurer may assume a duty to advise an insured in one of two ways: (1) he may expressly undertake to advise the insured; or (2) he may impliedly

---

[20]  An additional difficulty is presented by the absence of any allegation Plaintiffs actually saw, much less relied on or advised a Defendant of their reliance on, statements on All Risks' website. Plaintiffs do not even allege they were aware of All Risks' involvement in placement of the policy at any relevant time.

[21]  Under their claim for constructive fraud, Plaintiffs allege one or more Defendants "affirmatively represented [Plaintiffs] had purchased coverage which would protect [them] to the fullest extent available." ECF No. 22 ¶ 132. Because this allegation follows the negligence claim, it is not incorporated into it. The court, nonetheless, considers this allegation as one that might be added by future amendment.

> undertake to advise the insured. . . . An implied undertaking may be shown if: (1) the agent received consideration beyond a mere payment of the premium, [or] (2) the insured made a clear request for advice.

*Id.* at 347.

Taken together, Plaintiffs' allegations *and argument* may suggest they requested advice as to their insurance needs *at some time* from an insurance agent operating under the trade name KeenanSuggs Insurance.[22] The court need not decide whether the *collective* communications alleged or suggested raise an inference Plaintiffs "made a clear request for advice" to such an agent because Plaintiffs fail to distinguish between communications predating and postdating August 1, 2016. As Plaintiffs concede, Defendant HUB is responsible only for actions taken under the trade name KeenanSuggs Insurance after that date. The entity or entities operating under that trade name before August 1, 2016, are not before this court and Plaintiffs do not suggest any direct communication with any other Defendant that might constitute a "request for advice." Thus, Plaintiffs have neither alleged nor suggested potential allegations that might support an inference any Defendant undertook a duty to advise Plaintiffs as to their insurance needs.

**Agency Allegations.** Even if Plaintiffs' allegations were otherwise sufficient to support a negligence claim, they would fail for two related reasons: (1) Plaintiffs fail to attribute specific actions or representations to specific Defendants or provide the time when representations were made and (2) Plaintiffs instead rely on allegations all Defendants were agents and principals of each other. Relying on their agency allegations, Plaintiffs seek to impute knowledge of Plaintiffs'

---

[22] Whether Plaintiffs' claims should be dismissed turns solely on the *allegations* in the Second Amended Complaint. The court considers additional allegations suggested by Plaintiffs' *arguments* in determining whether Plaintiffs should be allowed a further opportunity to amend.

circumstances and alleged communications with any Defendant to all Defendants. Likewise, Plaintiffs seek to attribute all actions and representations of any Defendant to all Defendants.

Plaintiffs' agency allegations are insufficient to support an inference Defendants were agents (or principals) of each other because they rely solely on basic factual allegations regarding the roles played by each Defendant (as insurance agency, broker, and insurer). This is not, alone, enough to raise an inference any Defendant acted as agent or principal of another. The conclusion Defendants were *both* agents and principals of each other is also implausible, at least without more, given that one is normally either agent or principal, not both.

Plaintiffs' failure to distinguish between the different Defendants' actions or omissions is further exacerbated by Plaintiffs' failure to provide time frames in which the actions or omissions occurred. This is critical because Plaintiffs were insured under three distinct policies and, as Plaintiffs concede, one Defendant (HUB) is not responsible for actions predating August 1, 2016. Clearly HUB could not have been agent or principal of any other Defendant before this date. In sum, while the court does not foreclose the possibility Plaintiffs could allege facts that would give rise to an inference any Defendant acted as agent or principal of another Defendant, they have not yet done so.

**Duty to Inform vs. Duty to Read.** Plaintiffs' own duty to read the policies presents an additional obstacle to their negligence claim to the extent it rests on allegations Defendants had and breached a duty to "honestly and truthfully represent the extent of the coverage and to explain any limitations in coverage" or "correct their misrepresentations as to coverage or to affirmatively explain the [A&B Exclusion]." ECF No. 22 ¶¶ 117, 118; *see generally Keown v. Holman*, 234 S.E.2d 868 (S.C. 1977) (relying on *Doub,* 233 S.E.2d at 114, in holding insurance agent was entitled to a directed verdict on claim he negligently failed to renew policy where insured would

have learned of expiration date had he read the policy); *Carolina Production Maintenance, Inc. v. U.S. Fidelity and Guar. Co.*, 425 S.E.2d 39, 43 (S.C. Ct. App. 1992) (holding even if insurance agent was negligent, the insured was barred from recovery because its officers "admittedly did not read the policy despite the fact that it had been in effect for over a year."); *see also Lewis v. Omni Indem. Co.*, 970 F. Supp. 2d 437 (D.S.C. 2013) (granting summary judgment to insurer on claim insurer negligently misrepresented policy limits because "[i]t is well settled in South Carolina that an insured has the duty of reading his insurance policy and of acquainting himself with its contents" and "[f]ailure to do so will prevent him from avoiding the written contract on the grounds that he did not know its terms."). However, in the context of a negligence claim, it appears Plaintiffs' duty to read the policy provides an *affirmative defense* rather than defeating an element of the claim. For this reason, the court does not rely on this potential defense in resolving Defendants' motions to dismiss.

   **Conclusion as to negligence claim.** For reasons set forth above, the court dismisses the negligence claim as pleaded. Dismissal of this claim is with prejudice to the extent the negligence claim seeks recovery for failure to perform contractual duties. It is without prejudice to the extent it seeks to impose liability for any Defendant's failure to procure promised coverage or cure misrepresentations or known misunderstandings. Should Plaintiffs elect to replead this claim, they must provide substantially more detail in their factual allegations to raise an inference any Defendant owed or breached a relevant duty or acted as agent of any other Defendant.[23]

_____

[23]  In light of the deficiencies noted above, the court requires any future complaint specify the content, date and recipient of any statement Wells made to any Defendant that Plaintiffs allege gives rise to a duty of due care. Likewise, the complaint should specify the content, date and

## IV. Constructive Fraud Claim

Plaintiffs' constructive fraud claim seeks to hold all Defendants liable for actions or inactions of insurance agents working under the trade name KeenanSuggs Insurance. Despite conceding HUB is not responsible for events predating August 1, 2016, Plaintiffs make no distinction between HUB and whatever entity operated under this trade name before that date. Neither do Plaintiffs distinguish between events surrounding issuance of their three separate policies. Plaintiffs instead, rely on general statements such as that "Wells requested 'full coverage'" each time he purchased insurance and "[t]hese parties affirmatively represented" the coverage provided "would protect him to the fullest extent available." ECF No. 22 ¶ 132. They also assert "Wells was assured" he was covered for certain risks, without indicating the source, timing, or content of the assurance.[24]

This claim fails as a matter of law because a party to a contract may not recover based on claimed misrepresentations relating to its content when the truth is revealed by the contract itself. *See*, *e.g.*, *Doub*, 233 S.E.2d 111. As explained above (*supra* Discussion § I) the insurance policies at issue gave clear notice of the relevant exclusion, drawing attention to it both through lists of endorsements and multiple bold headings advising that endorsements changed the terms of the

---

speaker of any statement or action by a Defendant that Plaintiffs allege breached a duty of due care. If Plaintiffs seek to impose liability on any Defendant for the acts or omissions of another, they must allege facts sufficient to support the existence of an agency relationship. In requiring such specificity, the court considers both the deficiencies in the Second Amended Complaint and the court's authority to order a more specific statement under Fed. R. Civ. P. 12(e), where a complaint is so vague or ambiguous that a defendant cannot reasonably be expected to respond.

[24] The listed risks correspond directly with those in the quote from All Risks' website, which, as noted above, are not an assurance of coverage but simply a list of risks for which All Risks represented it could help insurance agents craft coverage for their insureds.

policy. The scope of the exclusion is both broad and clearly applicable to the type claims for which Plaintiffs now seek coverage. Plaintiffs had the opportunity to learn of this broad exclusion each time they received a policy (and throughout the policies' terms). Even if included for the first time in the Second Policy, Plaintiffs would have had notice of the exclusion nearly a year before the earliest incident for which they seek coverage (incident addressed in the Yarborough Lawsuit).

No allegations suggest Plaintiffs read the policy, were confused by some term, sought clarification from a Defendant and were misled by the response. *See Doub*, 233 S.E.2d at 114 (distinguishing *Riddle-Duckworth, Inc. v. Sullivan*, 171 S.E.2d 486 (S.C. 1969)). Thus, while such circumstances might allow Plaintiffs to pursue a claim despite arguably contrary contract language, no such claim is suggested by the Second Amended Complaint.

Given this deficiency, and in the absence of any suggestion of allegations that might cure the deficiency, the claim for constructive fraud is dismissed with prejudice.[25]

---

[25] The constructive fraud claim and fraud allegations in the second cause of action are also deficient for failure to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9. Most critically, Plaintiffs fail to provide specifics as to any allegedly false or misleading statements including the content of the statement, when it was made, by whom and to whom. Because these claims are dismissed with prejudice on other grounds, it is unnecessary to address the deficiencies in greater detail.

## CONCLUSION

For reasons set forth above, Defendants' motions to dismiss are granted and the Second Amended Complaint is dismissed in full. Dismissal is with prejudice as to all but the fifth cause of action, which is dismissed without prejudice. Entry of judgment shall be withheld for twenty-eight days to allow Plaintiffs an opportunity to replead as to the fifth cause of action.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
November 4, 2019